Gen. 307]                                                                 307

## PUBLIC SCHOOLS

**CONSTITUTIONAL LAW — FREEDOM OF RELIGION ESTABLISHMENT CLAUSE — FREE EXERCISE CLAUSE — FREEDOM OF SPEECH — GRADUATION PRAYER UNCONSTITUTIONAL — GUIDELINES ON RELIGIOUS ACTIVITIES BY STUDENTS AND OTHER GROUPS**

December 3, 1993

*The Honorable Rose Mary Hatem Bonsack*
*House of Delegates*

You have asked our opinion on a number of issues raised by one of your constituents concerning religious activities in Maryland public schools.[1]  Specifically, those inquiries include:

1.     Must a Maryland school system permit student-led prayer during graduation or baccalaureate services, if a majority of students favor the prayer and assurances are made that the prayer is not State-sponsored and that students need not participate in it?  If a school system is not obligated to permit such prayer, may it do so on a discretionary basis?

2.     May a student or school staff member possess a Bible or other religious literature on school premises and read it during non-instructional time?

3.     May students distribute religious literature in the school during non-instructional time?

4.     May members of the public use public school facilities during non-instructional time for religious activities?

---

[1] The questions are raised in an August 13, 1993 letter from Mr. George H. Gardner, which you forwarded to the Attorney General's Office with an opinion request on September 2, 1993.

5.    May students display religious materials on school bulletin boards where other non-curricular material is displayed?

6.    May schools restrict students' wearing of clothing or jewelry that depicts religious symbols or has other religious connotations while students are on school premises?

In our opinion, these questions are best answered as follows:

1.    School officials are neither required nor permitted to include a student-led prayer in a formal graduation ceremony, even if a majority of students vote to endorse the prayer.

2.    Students and staff members may possess religious literature, including a Bible, on school premises and read it during non-instructional time.

3.    A student's right to distribute religious literature on school premises is constitutionally protected, but it is subject to reasonable, generally applicable time, place, and manner restrictions established by school officials to ensure a safe and orderly school environment.

4.    If a school district allows any other community group to use public school facilities during non-instructional time, then it must provide religious groups with equal access to the facilities.

5.    Religious student groups must be afforded the same rights of access to bulletin boards as other non-curricular student groups, subject to reasonable, generally applied rules. Religious material may not be displayed in a manner suggesting that the school endorses a religious belief or message.

6.    Except in extraordinary circumstances, schools may not bar the wearing of religiously symbolic clothing or jewelry or single out any particular sect's religious attire or symbols for restriction.

This opinion first addresses the general constitutional principles underlying these conclusions and then addresses each of your questions in turn.

# I

## Constitutional Religious Protections and the Schools

### A. *Introduction*

The First Amendment to the United States Constitution provides two essential safeguards of individual religious freedom, with the cryptic command that "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof ...." The First Amendment is made applicable to the states through the Fourteenth Amendment.

The first of the two Religion Clauses, the Establishment Clause, forbids the government's endorsement of, or "excessive entanglement" in, religion or a particular church. *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971). The second, the Free Exercise Clause, bars the government from using its coercive powers to interfere with an individual's religious practice. *School Dist. of Abington Township v. Schempp*, 374 U.S. 203, 223 (1963).

As governmental entities, public school districts must adhere to the tenets of both the Establishment Clause and the Free Exercise Clause. As this opinion illustrates vividly, school systems often must navigate a very difficult course in honoring both safeguards. On the one hand, school districts risk running afoul of the Free Exercise Clause if they restrict an individual's religious activities and expressions on school premises; on the other hand, the Establishment Clause may prohibit schools from providing the assistance necessary to allow those activities to take place. Thus, school districts must struggle "to find a neutral course between the two Religion Clauses, both of which are cast in absolute terms, and either of which, if expanded to a logical extreme, would tend to clash with the other." *Walz v. Tax Comm'n*, 397 U.S. 664, 668 (1970).

The task of striking a balance between the Establishment Clause and the Free Exercise Clause is especially difficult in light of the current unsettled state of jurisprudence concerning the religious freedom provisions. Recent opinions of the Supreme Court and actions by Congress evince considerable controversy as to the

standards that should be applied to state action in the area of religion.

### B.    *The Establishment Clause*

The Supreme Court has described the scope of the Establishment Clause as follows:

> Neither a state nor the Federal Government can set up a church.  Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another.  Neither can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion...  Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and vice versa.

*Everson v. Board of Educ.*, 330 U.S. 1, 15-16 (1947).  The Court has held consistently that statutes mandating prayers in public schools, including a moment of silence expressly intended for student prayer, violate the Establishment Clause.  *Wallace v. Jaffree*, 472 U.S. 38 (1985).[2]  Most recently, the Court held that a school-sponsored nonsectarian prayer at a public school graduation ceremony offended the Establishment Clause.  *Lee v. Weisman*, 112 S.Ct. 2649 (1992).

To determine whether a governmental action violates the Establishment Clause, the Court devised a three-part test:  1) the statute must have a secular purpose; 2) its principal effect must be one "that neither advances nor inhibits religion"; and 3) the law must not foster "excessive government entanglement with religion."

---

[2] In *Jaffree,* the Court was troubled by the clear legislative history of the statute mandating the moment of silence.  That legislative history evidenced beyond doubt that the sole purpose of the statute was to institutionalize school prayer.  472 U.S. at 57-60.  While §7-104 of the Education Article, Maryland Code, also includes a provision permitting schools to establish a moment of silence at which students may pray, it has never been challenged, and we have no reason to believe that it suffers from the same constitutional defects as the legislation at issue in *Jaffree*.  *See* 67 *Opinions of the Attorney General* 37, 41-42 (1982).

*Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971). The *Lemon* test has been used without fail in Establishment Clause adjudication for the last twenty years. *County of Allegheny v. ACLU*, 492 U.S. 573, 592 n.44 (1989) (citations omitted). Typically, school prayer statutes have failed to survive one of the first two prongs of the test, as courts have held that school prayer requirements serve a religious purpose or primarily benefit religion or religious groups. *See, e.g., Wallace v. Jaffree*, 472 U.S. at 56.

In their deliberations concerning school prayer, as well as other school-related Establishment Clause challenges, the justices of the Supreme Court have emphasized that children are more "readily susceptible to unwilling religious indoctrination" than adults. *Jaffree,* 472 U.S. at 81 (O'Connor, J., concurring). *See also Tilton v. Richardson*, 403 U.S. 672, 685-86 (1971). Thus, the Court has tended to scrutinize school-based Establishment Clause allegations with more rigor than governmental actions affecting adults or the public at large.

To be sure, several Justices have expressed discontent with the *Lemon* standard.[3] The Supreme Court's recent decisions in this arena, often the product of divided opinions, have avoided rigorous application of the *Lemon* three-part test. *See, e.g., Zobrest v. Catalina Foothills School Dist.*, 113 S.Ct. 2462 (1993). Furthermore, on November 29 the Supreme Court agreed to review the use of the *Lemon* test in a case testing the constitutionality of a public school district coterminous with a religious enclave. *New*

---

[3] Among the Court's current members, four justices at one time or another have voiced dissatisfaction with the *Lemon* test and a desire to replace it with less stringent standards. In 1985, Justice Rehnquist did so in a dissenting opinion in the *Wallace v. Jaffree* school prayer case, 472 U.S. at 91. In *Lynch v. Donnelly*, 465 U.S. 668, 687-89 (1984), Justice O'Connor asserted that the *Lemon* test should be relaxed to prohibit only those governmental actions that directly endorse religion. In *Board of Educ. v. Mergens*, 496 U.S. 226, 110 S.Ct. 2356 (1990), Justices Scalia and Kennedy suggested that the Establishment Clause should bar governmental action only if it coerces participation in religion or so directly benefits religion that it "establishes" a state religion. 496 U.S. at 260-61, 110 S.Ct. at 2377.

*York State Attorney General v. Grumet, cert. granted* 510 U.S. 989.[4] Perhaps the decision in that case will yield a new methodology for analyzing Establishment Clause issues.

Nonetheless, as the Court observed in *Lee v. Weisman*, certain state religious involvements violate the First Amendment at its core, regardless of the formulation of any particular standard:  "It is beyond dispute that, at a minimum, the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which establishes a [state] religion or religious faith or tends to do so."  112 S.Ct. at 2655 (citations and internal quotation omitted).  Moreover, we are not going to "presum[e] to do what a federal or state court may not do – overrule Supreme Court cases before the Court itself does so.... Speculation about what the Court might do next year ... is not a sufficient basis on which to go beyond the limits of the law today." 74 *Opinions of the Attorney General* 3, 15-16 (1989).

## C.    The Free Exercise Clause and the Religious Freedom Restoration Act

The Free Exercise Clause protects individuals from governmental interference in the exercise of their religious beliefs. While the precise contours of its protections, like those of the Establishment Clause, are in flux at present, certain principles are undisputed.  At a minimum, "a law targeting religious beliefs as such is never permissible."  *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 113 S.Ct. 2217, 2227 (1993).  Moreover, it remains settled that "if the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral, and it is invalid unless it is justified by a compelling interest and is narrowly tailored to advance that interest."  *Id.* (citations omitted). Thus, school officials cannot single out religious activities or practices for limitation or prohibition unless they can demonstrate extraordinarily strong reasons for the restriction and can assure that those goals cannot be met by other means.

---

[4] The questions presented in this case are set out at 62 U.S.L.W. 3327.  The decision below is *Grumet v. Board of Educ.*, 81 N.Y.2d 518, 618 N.E.2d 94 (1993).

If a rule is neutral and of general application, however, an individual's ability to challenge it as a violation of the Free Exercise Clause is diminished drastically. In 1990, the Supreme Court upheld Oregon's denial of unemployment benefits to two Native Americans who had been dismissed from their jobs for violating the state criminal controlled substance law despite a Free Exercise Clause challenge by the employees, who argued that they only used peyote as part of a religious ritual. *Employment Div. Dept. of Human Resources v. Smith*, 494 U.S. 872, 110 S.Ct. 1595 (1990). The five-justice majority opinion stated the principle that "the right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" 110 S.Ct. at 1600 (quoting *United States v. Lee*, 455 U.S. 252, 263 n.3 (1982) (Stevens, J., concurring in the judgment)).

In response to the *Smith* decision, the United States Congress passed, and President Clinton recently signed into law, the Religious Freedom Restoration Act of 1993, Pub. L. No. 103-141. This legislation requires a state to show a compelling interest to support even a neutral rule that substantially restricts religious practice. Thus, as a matter of federal law, a broadly applicable school district rule that does not target religious practice but that does nonetheless constrain religious activities on school premises might well violate the Religious Freedom Restoration Act, even if not the Free Exercise Clause, if the reasons for the rule are less than "compelling."

## D.   *First Amendment Free Speech Protections and the Equal Access Act*

In addition to the safeguards afforded students and school staff by the Religion Clauses, the First Amendment's free speech provision also protects some types of religious expression on public school premises. The Free Speech Clause states simply that federal and state governments "shall make no law ... abridging the freedom of speech ...."

Students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Ind. Comm. School Dist.*, 393 U.S. 503, 506 (1969). However, the Supreme Court has emphasized in recent years that, because of the

special educational mission of public schools, educators may circumscribe the free speech rights of public school students more narrowly than public officials can limit those rights among the general public. Specifically, schools may limit some forms of student expression when the restriction is "reasonably related to legitimate pedagogical concerns". *Hazelwood School Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988). *See also Fraser v. Bethel School Dist. No. 403*, 478 U.S. 675 (1986). In addition, schools, like other governmental entities, may impose reasonable, generally applicable restrictions on the time, place, and manner of student expression. *Tinker*, 393 U.S. at 513.

If a school district allows the public, including various organizations, to use its facilities for student and non-student activities, then it must afford equal access to religious groups. *See Lamb's Chapel v. Center Moriches Union Free School Dist.*, 113 S.Ct. 2141 (1993) (equal access for public religious groups); *Board of Educ. v. Mergens,* 496 U.S. 226 (1990) (upholding Equal Access Act with regard to student religious groups). While schools may bar all non-curricular activities on their premises and may impose even-handed limitations on the use of school facilities that apply to all groups seeking their use, religious activities may not be singled out for restriction.

The Court's *Mergens* decision upheld a federal statute, the Equal Access Act, 20 U.S.C. §4071 through 4074, which establishes that:

> It shall be unlawful for any public secondary school which receives Federal financial assistance and which has a limited open forum to deny equal access or a fair opportunity to, or discriminate against, any students who wish to conduct a meeting within that limited open forum on the basis of the religious, political, philosophical, or other content of the speech at such meetings.

20 U.S.C. §4071(a).[5]

---

[5] In 69 *Opinions of the Attorney General* 100 (1984), Attorney
(continued...)

The Act defines a "limited open forum" as a school that allows "one or more noncurricular related student groups to meet on school premises during non-instructional time." 20 U.S.C. §4071(b). It further mandates that, in a school with a limited open forum, non-curricular related groups must be allowed to meet, provided that the meetings are voluntary and entirely student-initiated and that the meeting does not interfere with the school's educational activities or the constitutional rights of others. 20 U.S.C. §4071(c) and (d).

## E.    *Maryland Declaration of Rights*

Finally, Maryland's own constitutional protections of religious freedom deserve mention. Religious freedom is guaranteed in Maryland's Declaration of Rights in the rather lengthy provisions of Article 36.[6] While written with far greater specificity than the Religion Clauses of the First Amendment, Article 36 nonetheless

---

[5] (...continued)
General Sachs concluded that the Equal Access Act was unconstitutional, on the view that "the Act was designed with a specific, sectarian purpose in mind: to enhance the status of religious meetings in public secondary schools." 69 *Opinions of the Attorney General* at 126. *Mergens* overrules that conclusion.

[6] Article 36 reads as follows:

That as it is the duty of every man to worship God in such manner as he thinks most acceptable to Him, all persons are equally entitled to protection in their religious liberty; wherefore, no person ought by any law to be molested in his person or estate, on account of his religious persuasion, or profession, or for his religious practice, unless, under the color of religion, he shall disturb the good order, peace or safety of the State, or shall infringe the laws of morality, or injure others in their natural, civil or religious rights; nor ought any person to be compelled to frequent, or maintain, or contribute, unless on contract, to maintain, any place of worship, or any ministry; nor shall any person, otherwise competent, be deemed incompetent as a witness, or juror, on account of his religious belief ....

Nothing shall prohibit or require the making reference to, belief in, reliance upon, or invoking the aid of God or a Supreme Being in any governmental or public document, proceeding, activity, ceremony, school, institution, or place.

Nothing in this article shall constitute an establishment of religion.

generally affords the same protections. *See, e.g., McMillan v. State*, 258 Md. 147, 265 A.2d 453 (1970) (applying federal religious freedom principles to State and federal constitutional claims).

## II

### Student-Led Prayer at Graduation

Of all issues implicating religious freedom, none has troubled the Supreme Court more than that of school prayer. Over more than 30 years, the Court consistently has struck down even non-denominational school-sponsored prayers. *See Lee v. Weisman*, 112 S.Ct. at 2649; *Wallace v. Jaffree*, 472 U.S. at 38; *Abington School Dist. v. Schempp*, 374 U.S. at 203; *Engle v. Vitale,* 370 U.S. 421 (1962).

All of these cases, however, invalidated opportunities for prayer that were mandated by state law or organized and sponsored by school officials. Your query concerns prayer that is student-initiated and student-led, a situation about which the Supreme Court has never ruled directly. Nonetheless, we believe that the principles underlying the Court's school prayer decisions apply with equal force to the scenario that you describe and, accordingly, that it too would be barred by the Establishment Clause.

In all of its school prayer decisions, the Court's overriding concern has been the coercive effect of the religious activity. Most recently, in *Lee v. Weisman*, the Court repeatedly emphasized that a graduation prayer constituted "an overt religious exercise in a secondary school environment where ... subtle coercive pressures exist and where the student had no real alternative which would have allowed her to avoid the fact or appearance of participation." 112 S.Ct. at 2656. In numerous cases, the Court has observed that the especially impressionable nature of elementary and secondary school children results in a "particular risk of indirect coercion" in public schools, which must prompt "heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary schools." *See, e.g., Lee v. Weisman*, 112 S.Ct. at 2658 (citing *Abington*, 374 U.S. at 307); *Edwards v. Aguillard*, 482 U.S. 578, 584 (1987).

There are, of course, differences between the scenario you describe and the facts in the most recent Supreme Court decision on school prayer, *Lee v. Weisman*. In *Lee*, the school officially endorsed the prayer, chose a member of the clergy to lead it, and provided him with guidelines for the prayer. While the Court acknowledged that the level of state involvement in the graduation prayer contributed to its decision, we do not find that these factors were the Court's primary concerns. Ultimately, the Court found the graduation prayer improper because "the state has in every practical sense compelled attendance and participation in an explicit religious exercise at an event of singular importance to every student, one the objecting student had no real alternative to avoid." 112 S.Ct. at 2661.

Students are placed in the same coercive situation whether the prayer is student- or school-sponsored, and we cannot discern how the scenario that you describe overcomes this fundamental constitutional obstacle. When a school officially permits the student body to vote on whether to have a graduation prayer, and to allow the prayer as part of formal graduation ceremonies, all of the coercive pressures noted above come into play.

We acknowledge that attendance at one's graduation is generally an option but reject the view that coercion of dissenting students is diminished by the choice of refraining from attending the ceremony. As the Court observed, this argument "lacks all persuasion and reaches past formalism.... [T]o say that a teenage student has a real choice not to attend her high school graduation is formalistic in the extreme." 112 S.Ct. at 2659. Moreover, a statement that students are not required to participate in the prayer does not diminish the coercive pressure of the exercise. In *Lee*, the Court stressed that "adolescents are often susceptible to pressure from their peers toward conformity, and that the influence is strongest in matters of social convention." *Id*.

Second, it is immaterial, in our view, whether school officials choose the speaker or vest that responsibility with the student body. In either instance, the school must set aside time in the formal ceremony, insist that all present give the prayer their respectful attention, make efforts to either select a speaker of their choice or facilitate the selection of the student representative, and provide some guidance as to an acceptable prayer. Given all of these factors,

we cannot conclude that the type of student-led prayer described in your request could ever be understood as free of school endorsement or supervision.

Moreover, whether the inclusion of a prayer at graduation is decided by school officials or a majority of the student body is a distinction without a constitutional difference. The very existence of the Bill of Rights and, in particular, the First Amendment, was predicated on the need to protect the rights of individuals. As the Court observed in an earlier school prayer case, "the individual's freedom of conscience" is "the central liberty that unifies the various Clauses in the First Amendment ...." *Wallace v. Jaffree*, 473 U.S. at 51 (citing *Cantwell v. Connecticut*, 310 U.S. 296 (1940)). Appropriately, the Court focused its concerns on "the dissenter of high school age, who has a reasonable perception that she is being forced by the state to pray in a manner her conscience will not allow ...." *Lee*, 112 S.Ct. at 2658. Our focus is the same in answering your question, and therefore we conclude that a graduation prayer is not made constitutionally acceptable by a majority vote of the student body.[7]

Finally, we acknowledge the existence of circumstances under which student-led prayers in school are permissible. As the Equal Access Act and the *Mergens* decision make clear, such religious activities may occur on school premises, during non-instructional

---

[7] We recognize that a federal court of appeals (not the Fourth Circuit) has decided otherwise. *Jones v. Clear Creek Indep. School Dist.*, 977 F.2d 963 (5th Cir. 1992), *cert. denied*, 113 S.Ct. 2950 (1993). We are unpersuaded, however, by that court's conclusions that a student-led graduation prayer would bear no indicia of school endorsement and would not impose risks of student coercion. Further, any suggestion that the Supreme Court's denial of review in the case implies agreement with the Fifth Circuit's decision would be erroneous. *See, e.g., United States v. Carver*, 260 U.S. 482, 490 (1923) ("The denial of a writ of certiorari imports no expression upon the merits of the case, as the bar has been told many times.").

We note also that courts in other jurisdictions have held that student-led prayers at various public school events do violate the Establishment Clause. *Jager v. Douglas County School Dist.*, 862 F.2d 824 (11th Cir.) *cert. denied*, 490 U.S. 1090 (1989) (football games); *Collins v. Chandler Unified School Dist.*, 644 F.2d 759 (9th Cir.), *cert. denied*, 454 U.S. 863 (1981) (school assemblies).

time and without the involvement of school staff, if the school opens its doors to other non-curricular functions. *See* Part ID above.

While a graduation ceremony may not be an "instructional" activity, however, it can hardly be characterized as a limited open forum at which the principles underlying the *Mergens* decision might be read to mandate student-led expression. Indeed, if it were deemed a limited open forum, then we do not believe that a school could limit the opportunities for student participation to a single prayer. The absurdity of treating a graduation ceremony as a forum for the expression of any "religious, political, philosophical or other" student viewpoint, 20 U.S.C. §4071(a), underscores our conclusion that graduation prayer does not implicate the Equal Access Act or the principles underlying *Mergens* decision.

This is not to say that schools cannot offer any opportunities for religious expression associated with graduation ceremonies. In accordance with §7-104 of the Education Article, Maryland Code ("ED" Article), a school may permit a moment of silence, at which students may pray or engage in other contemplative activities. Also, in accord with the guidance of the *Mergens* and *Lamb's Chapel* decisions, student groups may use public school facilities to conduct voluntary, private baccalaureate or prayer services and other ceremonies for graduates. *See* Part V below. Similarly, we do not believe that the Establishment Clause would require school administrators to remove all religious references from the speech of the school's valedictorian or other graduation speaker who was selected for non-religious reasons and clearly expresses his or her own personal views.

Since our reasoning so closely follows that of the Supreme Court in its recent *Lee* decision, we rely on the Court's words to summarize our analysis:

> Our society would be less than true to its heritage if it lacked abiding concern for the values of its young people, and we acknowledge the profound belief of adherents to many faiths that there must be a place in the student's life for precepts of a morality higher even than the law we today enforce. We express no hostility to those aspirations....

> The sole question presented is whether a religious exercise may be conducted at a graduation ceremony in circumstances where, as we have found, young graduates who object are induced to conform. No holding by this Court suggests that a school can persuade or compel a student to participate in a religious exercise.
>
> That is being done here, and it is forbidden by the Establishment Clause of the First Amendment.

*Lee*, 112 S.Ct. at 2661.

Accordingly, we conclude that a school district is neither required nor permitted to include a student-led prayer in its formal graduation ceremonies, even if a majority of students vote to endorse the prayer.

## III

### Possession of Religious Literature at School

We can identify no constitutional or other legal obstacle to the possession of religious literature on school premises by students and staff, or to their reading of Bibles during non-instructional time.[8] We assume that schools generally do not bar students and staff from carrying or silently reading non-curricular material during non-instructional time. *See* 69 *Opinions of the Attorney General* 100, 122 (1984) ("If students at a table in the cafeteria decide to read the Bible together or pray after eating, they may simply go ahead and do so, just as they might proceed freely to form a study group on some secular subject."). Thus, a rule prohibiting religious literature in schools could only be interpreted as a content-based restriction on religious freedom.

---

[8] We are not discussing *distribution* of Bibles by school officials, which would of course violate the Establishment Clause. 65 *Opinions of the Attorney General* 186 (1980).

We believe that such a rule would violate the Free Exercise Clause as a non-neutral restriction that applies only to religious practice. As such, a school system would have to articulate a compelling reason for the restriction. *Church of the Lukumi Babalu Aye*, 113 S.Ct. at 2227. We can imagine no rationale that is sufficiently strong to bar silent scripture reading during non-instructional time.

Moreover, ED §7-104 provides that school districts may require a daily period of silent meditation in which "a student or teacher may read the holy scripture or pray." Obviously, that statute would be thwarted by a rule barring the reading of Bibles on school premises. Thus, under State law as well as federal constitutional principles, we conclude that such a rule would be prohibited.

Of course, schools retain the authority to limit generally the possession and reading of non-curricular materials on school premises. Thus, for example, our analysis does not necessarily prohibit a school from requiring students to keep all non-curricular materials off of their desks during school hours. Similarly, our analysis is confined to silent reading, and our conclusions might well be different if, for example, the conduct at issue involved proselytizing in school hallways in a manner that disrupted student work or the orderly flow of traffic. *See* Part IV below.

In sum, while schools may impose generally applicable restrictions on students' use of non-curricular materials during school hours, we believe that a rule that specifically bans the possession of religious literature on school premises during non-instructional time would violate the Free Exercise Clause of the First Amendment.

## IV

## Distribution of Religious Literature

It is well-established that "the oral and written dissemination of ... religious views," including the distribution of literature, is protected by the First Amendment. *Heffron v. International Society for Krishna Consciousness*, 452 U.S. 640, 647 (1981); *Schneider v. State*, 308 U.S. 147 (1939). It is equally settled that the right to distribute literature is subject to the reasonable time, place, and manner restrictions. *Heffron*, 452 U.S. at 648. Such restrictions are valid if they "serve a significant governmental interest," *id*. (quoting *Virginia Pharmacy Bd. v. Virginia Citizens Consumer Council*, 425 U.S. 748, 771 (1976)), and allow for "alternative forums for the expression of respondents' protected speech ...." 452 U.S. at 654.[9]

Within this constitutional framework, we confidently can draw certain general conclusions regarding the distribution of religious literature in schools. First, if schools create a "limited open forum" by permitting the distribution of any non-curricular literature by any student or group of students, then they cannot ban the distribution of religious literature per se. *Heffron*, 452 U.S. at 648 (citing *Consolidated Edison Co. v. Public Service Comm'n*, 447 U.S. 530, 536 (1980) (restriction on expression "may not be based upon either the content or subject matter of speech")). Second, schools possess considerable latitude in limiting the time, place, and manner of the distribution of literature. The courts have held repeatedly that protecting the "safety and convenience" of the public and even maintaining "the orderly movement" of a crowd may justify time, place, and manner restrictions. 452 U.S. at 649-50 (citing *Grayned v. City of Rockford*, 408 US. 104, 115 (1972)). This deferential standard, coupled with the Court's current view that the First Amendment rights of school children are more circumscribed than

---

[9] The *Heffron* decision, upon which we rely in this section, upheld a Minnesota State Fair rule that restricted the exhibition, sale, and distribution of materials during the State Fair to a limited number of fixed locations. The rule was challenged unsuccessfully by the International Society for Krishna Consciousness, which argued that distributing literature and soliciting donations from the public was part of its religious ritual. The Court held that the restriction was an evenhanded, content-neutral limitation justified by the state's need to maintain orderly crowd movement, and the rule did not foreclose the group's access to alternative forums for expression outside the fairgrounds. 452 U.S. at 640.

those of the general public, *Fraser*, 478 U.S. at 675, suggests that strict regulation of the distribution of literature on school premises is permissible under the First Amendment.

Of course, any such restriction must be neutral and not targeted at religious literature, so as to withstand scrutiny under the Free Speech Clause, *Lambs Chapel*, 113 S.Ct. at 2146, and the Free Exercise Clause, *Church of the Lukumi Babalu Aye*, 113 S.Ct. at 2227. Furthermore, it should not serve as a total ban on expression. *Heffron,* 452 U.S. at 654. For example, while we believe that it may be acceptable for school officials to prohibit the student-initiated distribution of literature in the school hallways and rooms during the school day, we question whether a ban that extends to areas surrounding the building and applies past the normal school day could withstand First Amendment scrutiny. Moreover, a complete prohibition may also amount to the kind of "substantial" burden on religious expression that implicates the Religious Freedom Restoration Act.

Questions concerning distribution of religious literature are the subject of much recent litigation nationwide. *See, e.g., Gregoire v. Centennial School Dist.*, 907 F.2d 1366 (3d Cir.), *cert. denied*, 498 U.S. 899 (1990); *Rivera v. East Otero School Dist.*, 721 F. Supp. 1189 (D. Colo. 1989); *Thompson v. Waynesboro Area School Dist.*, 673 F. Supp. 1379 (M.D. Pa. 1987). Because much depends on the circumstances of a particular case, we refrain from an effort to set forth detailed guidelines in this area. Our answer to your question is accordingly general: While the right of students to distribute religious literature on school premises is protected by the First Amendment, it is subject to reasonable time, place, and manner restrictions established by school officials to ensure a safe and orderly school environment.

## V

### Public Use of School Facilities For Religious Activities

ED §7-108 permits the use of school premises for community purposes, including religious activities. That statute states that "[e]ach county [school] board shall encourage the use of public school facilities for community purposes," ED §7-108(a), and authorizes such use for:

(i)  The presentation and discussion of public questions;

(ii)  Public speaking;

(iii)  Lectures; or

(iv)  Other civic, educational, social, or recreational purposes or church affiliated civic purposes.

ED §7-108(b)(1).  In addition to the functions enumerated above, ED §7-108 provides that "[e]ach county board may permit the use of public school facilities for religious or other purposes."  ED §7-108(d).  Use of facilities may be refused if it appears that the activity may threaten a riot, breach of peace, or other danger to public safety and welfare. ED §7-108(b)(3). Similarly, community use of schools is limited to circumstances in which it "will not interfere with regular school sessions or other bona fide school activities". ED §7-108(e). *See generally* 76 *Opinions of the Attorney General* 147 (1991).

The principles that underlie Maryland's statutory encouragement of broad community use of public school premises were reinforced by the United States Supreme Court in its recent decision in *Lamb's Chapel v. Center Moriches Union Free School Dist.*, 113 S. Ct. 2141 (1993). Reviewing a school system's decision to bar access to school premises for a film series on family values sponsored by an Evangelical Christian Church, when it permitted such access to a range of other community groups, the Court held unanimously that the school system's action violated the Free Speech Clause of the First Amendment. The Court acknowledged that a school district "need not have permitted after-hours use of its property for any ... uses," 113 S. Ct. at 2146, but went on to find that the film series at issue "no doubt dealt with a subject otherwise permissible [for discussion on public school premises under state law], and its exhibition was denied solely because the film dealt with the subject from a religious standpoint." 113 S.Ct. at 2147. Thus, the Court held that exclusion of the film series violated First Amendment principles forbidding the state from regulating speech "in ways that favor some viewpoints or ideas at the expense of

others." 113 S.Ct. at 2147-48 (quoting *City Council of Los Angles v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984)).

It is clear from the *Lamb's Chapel* decision that, once a school district opens its doors to community use, it cannot bar access to church-related groups because of their religious affiliations or the religious content of the activity. For Maryland school systems, which generally permit community use of schools pursuant to ED §7-108, the decision removes any discretion they may have exercised in determining whether to allow the use of their premises for religious purposes, as provided by ED §7-108(d). If a religiously affiliated group seeks after-hours use of a Maryland school facility, and that request otherwise comports with the provisions of ED §7-108, a school district must permit access.

# VI

## Display of Religious Materials on School Bulletin Boards

The federal Equal Access Act bars discrimination against students who wish to conduct a meeting for religious purposes. In *Board of Educ. v. Mergens*, the Supreme Court determined that it was not enough for a school merely to allow a religious group to meet on school premises, if other non-curricular clubs enjoyed other privileges. 110 S.Ct. at 2356. While the school in *Mergens* had permitted the religious group to use school premises informally, it did not grant them the same "official recognition" that it afforded other clubs.

The Court found this practice to violate the Equal Access Act, because only officially recognized clubs enjoyed access to school bulletin boards, the public address system, the school newspapers, and the annual club fair. 110 S.Ct. at 2370. Thus, to the extent that a school permits other non-curricular organizations to use bulletin boards and other school media sources, it must permit religious clubs to do so as well.

Of course, once again, schools may impose reasonable, non-discriminatory restrictions on the time, place, and manner of materials that students wish to display on school premises. If a school generally limits such displays to certain bulletin boards,

restricts the size or number of posters, or insists that the permission of the school administrators be obtained before posting, then the school may also impose the same conditions on the display of the materials of student religious groups.[10]

For schools that elect to allow religious groups to display religious materials on school premises, we add one final note of caution. The Supreme Court has consistently held that sectarian religious communication on government premises may violate the Establishment Clause if the presence of the display "has the effect of promoting or endorsing religious beliefs." *Allegheny County v. Greater Pittsburgh ACLU*, 492 U.S. 573, 621 (1989). Even if the display is sponsored by a private organization, rather than the school, a display may offend the First Amendment if it is purely religious in nature, appears prominently on government premises, proclaims a sectarian religious message, and in other ways suggests the school's endorsement of the religious communication. *Id.*[11]

Given the unsettled state of jurisprudence on this issue, we are unable to establish precise parameters by which to judge the constitutionality of sectarian religious displays on school bulletin

---

[10] School administrators possess some control over the content of "expressive activities that students, parents and members of the public might reasonably perceive to bear the imprimatur of the school." *Hazelwood School Dist. v. Kuhlmeier*, 484 U.S. 260, 270-71 (1988). In this opinion, however, we have no occasion to consider the range of considerations that may justify an administrator's decision to reject material for display on a school bulletin board.

[11] In *Allegheny County*, for example, the Court found a creche display sponsored by a local Holy Name Society and placed in the main staircase of the county courthouse to violate the Establishment Clause as having the effect of endorsing a purely religious message. 492 U.S. at 612-13. At the same time, the Court upheld the display of a Hanukah menorah and a Christmas tree in front of another county building as "conveying the city's secular recognition of different traditions for celebrating the winter-holiday session." 429 U.S. at 620. Not surprisingly, this imprecise legal standard has resulted in inconsistent lower court decisions. *Compare, e.g., Smith v. County of Albemarle*, 895 F.2d 953 (4th Cir. 1990) (nativity scene on courthouse lawn violates Establishment Clause) *with Chabad-Lubavitch v. Miller*, 62 U.S.L.W. 2360 (11th Cir. Oct. 18, 1993) (menorah in state capitol rotunda does not violate Establishment Clause).

boards.  Nonetheless, school officials should be sensitive to the above factors when offering the use of bulletin boards and other media sources to religious groups.


# VII

## Students' Wearing of Religious Symbols

Wearing attire that depicts religious symbols or has other religious connotation may be an expression of a student's religious beliefs that is protected by both the Free Exercise and the Free Speech Clauses of the First Amendment.  In *Tinker v. Des Moines Indep. School Dist.*, 393 U.S. 503 (1969), the Supreme Court held that students' wearing of black armbands to protest the Vietnam war involved "direct, primary First Amendment rights akin to 'pure speech.'"  393 U.S. at 508.  The wearing of religious symbols, we think, implicates free speech rights with similar force.  Moreover, as a form of profession of one's religious beliefs, the wearing of religiously symbolic attire is protected by the Free Exercise Clause. *Smith*, 110 S.Ct. at 1601, and should fall within the scope of the Religious Freedom Restoration Act.

The same standards apply if school officials wish to bar the wearing of only certain kinds of religious symbols.  We understand, for example, that some school officials are particularly concerned with the influence of so-called "cult" religions on students and may attempt to prohibit students' wearing of cult symbols.  However, cult religion receives the same protection as traditional faiths under the First Amendment.  "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Allegheny County*, 492 U.S. at 605 (*quoting Larson v. Valente*, 456 U.S. 228, 244 (1982)).  Even cult religions that many people may find utterly offensive enjoy First Amendment protection. *Thomas v. Review Board*, 450 U.S. 707, 714 (1981) (First Amendment protects religious beliefs that may not be "acceptable, logical, consistent or comprehensible to others").

Therefore, we conclude that school officials generally may not bar religiously symbolic attire on school premises, nor may they single out certain types of religious symbols for prohibition, except under extraordinary circumstances.  Specifically, school officials

must be able to justify the restriction with "compelling" reasons and must demonstrate that the restriction was the least restrictive means to achieve those ends. *Larson,* 456 U.S. at 246 (Establishment Clause); *Church of the Babalu Aye*, 113 S.Ct. at 2227 (Free Exercise Clause); *Widmar v. Vincent*, 454 U.S. 269 (1981) (Free Speech Clause).[12]

How a student's right to wear religious symbols relates to a school's authority to enforce general dress codes is less clear. In *Tinker*, the Supreme Court's most expansive reading of students' free speech rights to date, the Court went out of its way to note that its holding did not relate to "regulation of the length of skirts or the type of clothing, to hair style, or deportment." 393 U.S. at 507-08. Thus, the Court has left open the possibility that a school's interests underlying the establishment of a dress code may sometimes override a student's First Amendment rights.

We understand that some school dress codes bar attire like gold jewelry, vulgar tee-shirts, caps, and various gang-related apparel, and that these restrictions are based upon a range of justifications, from violence prevention to instilling conventional manners in the student body. As noted in earlier parts of this opinion, restrictions on the time, place, and manner of expression must be designed to protect a substantial governmental interest and must not be so restrictive as to eliminate all forums for expression. *Heffron*, 452 U.S. at 649-55. Thus, a ban on the wearing of caps in the school building aimed at teaching children traditional forms of courtesy may not overcome First Amendment scrutiny (or scrutiny under the new Religious Freedom Restoration Act) if the effect is also to prohibit entirely the wearing of religious headware in school. By contrast, a ban on gold jewelry established to reduce school violence may not offend the Constitution, even if it prevents a student from wearing a religiously symbolic pendant, because the rule protects a critical interest and allows for the wearing of other types of religiously symbolic jewelry.

---

[12] We recognize that the Supreme Court has used a standard more deferential to school officials with respect to the Free Speech Clause, and we would not be surprised if it did so on dress restriction issues as well. *Hazelwood School District v. Kuhlmeier*, 484 U.S. at 270-71. However, the same deference has never been applied to content-based First Amendment religious freedom restrictions.

Since each instance of a possible clash between students' free speech rights and school dress codes will be highly fact-specific, and because there is no consistent precedent on this issue, we cannot offer any bright-line test for resolving such conflicts. At this time, we conclude only that the Freedom of Speech and Religion Clauses of the First Amendment, and now the Religious Freedom Restoration Act, protect a student's right to wear religiously symbolic clothing and jewelry to school, and that school officials cannot prohibit such attire without compelling reasons. However, under certain circumstances, a school may enforce its general dress code in a way that limits the wearing of religiously symbolic attire in school premises.

# VII

## Conclusion

In summary, our opinion as to the issues that you raised are as follows:

1. School officials are neither required nor permitted to include a student-led prayer in a formal graduation ceremony, even if a majority of students vote to endorse the prayer.

2. Students and school staff members may possess religious literature, including Bibles, on school premises and read it during non-instructional time.

3. A student's right to distribute religious literature on school premises is constitutionally protected, but it is subject to reasonable, generally applicable time, place, and manner restrictions established by school officials to ensure a safe and orderly school environment.

4. If a school district allows any other community group to use public school facilities during non-instructional time, then it must provide religious groups with equal access to the facilities.

5. Religious student groups must be afforded the same rights of access to bulletin boards as other non-curricular student groups, subject to reasonable, generally applied rules. Religious material

may not be displayed in a manner suggesting that the school endorses a religious belief or message.

6.     Except in extraordinary circumstances, schools may not bar the wearing of religiously symbolic clothing or jewelry or single out any particular sect's religious attire or symbols for restriction.

J. Joseph Curran, Jr.
*Attorney General*

JoAnn G. Goedert
*Assistant Attorney General*

Jack Schwartz
*Chief Counsel*
  *Opinions & Advice*